I think of this case, and first of all, the judge decided against me on the legal issues in this case. I think the judge said that if there's a preliminary examination, probable cause has been determined at the preliminary examination, that that forever precludes the filing of a malicious prosecution lawsuit. That's what they said. So if somebody goes to a preliminary examination and they lie, and the judge or the magistrate believes there's enough evidence to bind that thing over, and then the prosecutor realized the complaining witness has lied, would the defendant ever have a remedy against the complaining witness because a magistrate somehow bound the case over? I don't think that's reasonable. I don't think that's what this Court has ruled in the past. What this Court has ruled in the past is prima facie. It puts the burden on the other side to show that there was some sort of fraud or some sort of corruption or something that was wrong in the magistrate's ruling. Well, if we agree with you on that, how do you get around the Smitty v. Barney line of cases that say, basically, that say that once an independent, once the prosecutor exercises independent judgment, that's the end of the case for you? Your Honor, Justice Ginsburg, the prosecutor in this case made a self-serving statement.  And I wanted to test that statement at trial. I wanted to find out who really was the driving force behind this lawsuit. But I had a case to present. Leroy Edwards was a man who had, you know, accumulated a bunch of equipment, steel he sells for scraps, and old cars he'd been in for a matter of years, and he was a thorn in the county's side. It starts there. And that had been going on for years. And he'd been grandfathered. And the evidence in this case showed that he'd been grandfathered in, in the area in which he was, and the city of Bakersfield now had grown out around him. So there was an ongoing dispute between he and this man, one of the defendants in this case named Bill Arulia. There, after the, in the 19, or the year 2000, there was a, pursuant to a warrant, there was an inspection of his property, of Kenneth's property. In November, December of the year 2000, there was a civil lawsuit filed. There was an injunction that was sought to close these people down from continuing to operate Action Pumping. The injunction was denied. And Mr. Arulian, Mr. Buss, and Mr. Gray were present at that hearing. As we walked out from the hearing, I had two witnesses who heard Mr. Arulian say, Mr. Arulian denied this. Mr. Arulian said, you people don't know what's in store for you. I was there when the remark was made. But that's what he said. And I have declarations that those, that remark was made. So I have an ongoing dispute. That's circumstantial. I have Mr. Arulian, they attempt to close these people down. They're unsuccessful. Mr. Arulian in the hallway says, you people don't know what's in store for you. We walk out and think this matter's closed. They're going to continue to do business. They're going to look at us closely, but that's okay. Four months later, all these people go to jail. Warrants are issued and they're all arrested. Then we have evidence that there are two elderly women, actually younger than I am, I guess, and that they had called Action Pumping or American Pumping out to pump a septic tank that the people drove out, Kenny and Leroy drove out to Derby Acres, which is approximately 45 miles from Bakersfield. Evidence was clear that they took that dirt off the top of the septic tank, stuck the hose down in. There was splatterings all around. So it was obvious, I mean, it was apparent, we had some evidence to offer that the pumping job was done. Roxanne Ayala, who wasn't even there, was charged as a co-conspirator in this. So they alleged she was a co-conspirator. She wasn't even there. Then we later learned that the problem wasn't in the septic tank itself, but the problem was in the line from the house to the septic tank. And they charged Kenneth and Leroy with a felony. Right. Well, I think what I was driving at is this. I mean, for good or ill, our case law basically says you can have all the malice in the world, but if a prosecutor exercises independent judgment in filing a complaint, that cuts off the malicious prosecution claim. So what's your best evidence that you have at the moment that the prosecutor didn't exercise independent judgment? I know that you're saying it's inferential because of the history, but do you have anything directly? Only when Mr. Arulian said, you people don't know what's in store for you. Prosecutor at that time said criminal action wasn't even, we didn't know anything about that at that time. He had to have known about it at that time. Secondly, Terry Gray, I mean, Terry Buss, signed a verification under penalty of perjury, saying I know, I believe that these things are true and correct when he was alleging that these people had committed felonies. Well, there was no evidence of that. The elderly ladies called in and all they asked for was a rebate. But he said under penalty of perjury, he declared under penalty of perjury, that there was sufficient evidence to cause these people to be arrested. And there was no such evidence. Judge said at the trial before the case was dismissed, he said your case is the thinnest of the thin in getting thinner every moment. Judge recognized that. So Buss signed the verification. Arulian says you guys don't know what's in store for you. They have the technical knowledge. They were the ones that said you have contaminated waste being stored in your tanks. The prosecutor wasn't able to understand those fingerprint tests and to read them. Then they told the prosecutor, you don't have any evidence there. There is no evidence that there's contaminated waste that had been described there. So they go into plan number two and they said, well, you're throwing some batteries around and so forth. Well, the raid was done in June of 2000. They were prosecuted for this in April of 2001. And in July of 2001, right after they were successful at the trial, there's an administrative hearing. And who testifies there? Buss, Arulian and Gray. They testified, all of them, saying we're going to take away your license. So they lost. And then Fred Jones would have testified, if we'd been allowed to get him, that Arulian put pressure on him to terminate his agreement, his rental agreement, with Leroy Edwards. We went out there and defended that action. Court dismissed it. And Fred Jones was unsuccessful. So they placed pressure on Jones. We had evidence of that as well. We weren't allowed to put any of that evidence on. I came to court. I had a case. I missed the deadline as far as the city was concerned. I did do that. The city filed a 1,000-page document on, I believe, December 9th. I missed the deadline. I had to get that in, I think, 15 days thereafter. I explained in my papers why I missed that deadline. I had another motion. First time of judgment was due on the 21st. I visited my mother down in Los Angeles, whatever the reasons were. I came to court on the 4th and asked for an extension of time. When I asked for the extension of time, I got a call that same day from Mr. Rebus on the other side. He said, I'm going to oppose your request for an extension of time. I could not respond to that motion because it was just, it was 1,000 pages of documents that I got. I think I picked it up on January 14th. But I was, you know, in the state court, it says that any time I can ask for an extension of time. And I just blew that one. I should have asked for it four or five days before. I mean, I could have done it ex parte. But during the course of these hearings, not one or the proceedings, I never got the opportunity once to stand before that judge and to make my pitch. So it really was an ex parte application. But I filed it and I supported it with supporting documents. It was opposed and the judge denied that. Now, there was no prejudice to the other party. They can't say there was any prejudice. The trial was some time off in the future. At that point in time, the county had not filed their motion for summary judgment. That was out of court as to the city. So I felt that was wrong. The judge made that decision like that. I mean, two days after I filed it, he said, you're out of court. Then I came back into court subsequently and I said I blew it based upon a mistake, excusable neglect and so forth. And he ignored that and said, no, you can't have that. Well, my opinion is there was no prejudice. I blew it by a couple of days. I felt that the state statute would be the same as the federal statute. But I really felt this, that no judge would grant a motion for summary judgment because I asked for an extension of time before the motion was going to be heard. I just felt that the policy of law in this country is that matters should be heard on their merits wherever possible. I believe that. And that judge said, no, whatever the statute says, you're cut off. I want to make another point while I'm here. I talked about the legal issue, the issue of a preliminary examination and the magistrate and so forth. They cite, and there's one case that they continually cite, I think it's McCutcheon v. City of Montclair. But there is a whole other line of cases, including Abadie, which was the decision of this court. And all it says is that it is a prima facie case, the fact that the magistrate and so forth did this, but it's rebuttable. I never got my opportunity to do that. The city argues, the county argues that there was not a favorable termination on the merits. When I walked out of that courtroom in the criminal case, Jeopardy had attached. Once the jury's impaneled, the first witness testifies, it's sworn to testify, Jeopardy attached. So the judge admonished the prosecutor. He said, your case is as thin as a thin. He said, in a civilized society, we don't prosecute people by standards without some sort of legal standards, not just by what's in the eye of the beholder. Immediately after that, the prosecutor dismissed the case. Just chastised him severely. But the point is this. It was a favorable termination. Because when we walked out of there, they could never refile that case. They could never reprosecute that case. It was done. So we were favorably terminated. So your question was, do I have evidence? I have an ongoing scheme, plan, or design. I have an admission. I have a statement. I have a verification signed under penalty of perjury that was false. I have an accusing Roxanne Eyal of conspiring to cheat Ms. Honeycutt and Ms. Kinney. She wasn't even present on that day. Had no idea that it was going on. I mean, if they filed and he and Mr. Buss verified that she was part of this conspiracy to cheat these old ladies, elderly women, younger than I am. I think we have your argument at hand. I appreciate it. I have one question, counsel. Looking at your reply brief, do you cite to the record any place? Sir? Pardon? I'm sorry, I can't hear you. Do you cite to findings of fact or to the record any place in your reply brief? Was this another rush job? Probably. The reply brief? No, I don't think so. I think. Okay. I don't think so. I mean. And I think. You're here on questions of law. Sir. I am. The facts are established in a trial court and the law is subject to reversal here. But it helps us if we have some cites to the record when we're trying to. Your Honor, I went through that last night and I was very careful in their statement of the fact. I know. I was very careful to point out what my position was and what my position was in relation to the facts that they had brought to the court's attention. There's sometimes that we may look at the fact that you have cited and it's correctly and properly stated and we look around a little bit and maybe we get a little different flavor to it and maybe we want to read the colloquy between the court and counsel, but we don't get it because you don't give us the cites. That's part of the rule. It's very helpful to us. I'm sorry. I'm just talking about it to help you. I appreciate that. I'm not being critical. I'm not going to sanction you or anything like that. We're rushed with a ton of stuff and we would like the help of attorneys, so we want to come to the right result. I see. And that's how we get there. Thank you, counsel. Good morning. I'm Charles Collins. I represent the County of Kern, Bill O'Roulean and Terry Gray. And the city and the county are going to split their time here, if you would, Your Honor. As to just a response, the county was not involved in this whole situation regarding whether or not there was adequate time to file a response to the motion, the city's motion for summary judgment. The county filed its motion for summary judgment after that whole issue had gone to appeal. So those issues, although sometimes raised in the briefs as to the county and the city, they really are the city's issues and the city's counsel will address those. As to the crux of the case, I really think that Your Honor hit on it. It relates to that whole Smitty v. Varney line of cases relating to the independent judgment of the prosecutor. But even if that line of cases was not there, there's simply no evidence in this case that there was any sort of interaction between Mr. O'Roulean and Mr. Gray, who are environmental specialists for the Kern County Environmental Health Department, and Mr. Craig Smith, the deputy district attorney, relating to the initiation of the criminal case. There was some information in a report from Mr. O'Roulean to Mr. Smith, which he reviewed. There's really no evidence of any contact between Mr. Gray and Mr. Smith relating to either count. Mr. Gray was involved in the inspections relating to count two. He wasn't involved in any way with count three. And that's the state of the evidence on that. Mr. Smith, although the appellants may argue that it was a self-serving statement, we have his declaration. And he was deposed in this case. If appellants were going to be able to test his testimony, they had their chance. And there's simply no evidence before this Court that anyone else besides Deputy District Attorney Smith initiated this criminal prosecution. I think one great example of that is count two relates to a health and safety code that was never mentioned in any of Mr. O'Roulean's reports. This came out of Mr. Smith. It came out of no one else. Furthermore, Mr. Smith, as to count two, he went out and viewed the properties at issue, and as to count three, he went out not only and viewed the property, but he talked to the witnesses. Mr. O'Roulean and Mr. Gray are not prosecutors. They didn't urge him to prosecute. And more importantly, they never reviewed the criminal complaint before he filed it. After it was filed, Mr. Gray actually called Mr. Smith up and told him as to one test, that the test was not sufficient to determine whether there was true hazardous waste. It showed a fingerprint of hazardous waste, but it didn't show a concentration. That's hardly the type of thing a co-conspirator would do if they were after the appellants in this case. Nor is there any evidence that there was any improperly exerted pressure or any deception from Mr. O'Roulean and Mr. Gray relating to Mr. Smith, particularly it's so apparent as to Mr. Gray. He didn't have anything to do with count three. As to count two, the only contact he had with Mr. Smith was after the complaint was filed, telling him that what could only be looked at as kind of exculpatory information. Moreover, Mr. Gray testified at the trial in the preliminary hearing. One of the appellants, Kenneth Edwards, actually testified that Mr. Gray told the truth at trial. Mr. O'Roulean never testified at the preliminary hearing or at the trial. They simply weren't involved in that way. Mr. Collins, what would be your succinct statement of what the Court's bottom line should be on the county and the parties that you represent, Gray and what have you? When we look at the record, what should we look for and what should we find in your view? Your Honor, I think the crux of it relates to this whole question of their contact with Mr. Smith. And I think set forth in their declarations and Mr. Smith's declarations, that is really the evidence before the Court as to what the contact between those individuals are. And what it will show is an independent prosecutor who's doing his job, coming up with his own theories, doing in some ways his own investigation of these things, and not some sort of massive conspiracy between the people in the Environmental Health Department and Mr. Smith. And I think at the end of that, Your Honor, there simply is no evidence that would support any sort of finding that the county, Mr. Gray or Mr. Arulian, had anything to do with the initiation of this criminal case, besides the fact that Mr. Smith, of course, is a Deputy District Attorney. But he's acting independently on that, not as a county actor, but actually as a state actor. I also think that when you look at, and I think the counsel hit on it earlier, really the only thing that ever has existed in this case to link Mr. Arulian, Mr. Gray is even further out in the stratosphere as far as relationship, but Mr. Arulian is this statement, this ambiguous statement that you do not know what is in store for you, that was said after some hearing, an injunction in an earlier civil case, an injunction case. But there's many possible explanations for that. Usually when somebody says that, they're not meaning there's going to be a very pleasant surprise. I mean, that statement is usually used in a threatening way, wouldn't you say? Your Honor, it would depend on the context. And that's what's lacking in this. I mean, what we have as far as information, even assuming everything the appellant says is correct about this statement, it's after a hearing in which an injunction, the injunction that was sought there by the DA's office and the city attorney's office was not granted as sought, but there was an injunction that was granted and that they follow the law. And afterwards you have this statement. Now, that's what we don't have any context for. Does it mean that Mr. Arulian is going to be involved in the administrative hearing in which their license was taken? Does it mean there's some criminal action coming down the road? I think counsel said four months later. There was all sorts of ongoing matters here, but that doesn't mean they're all on the same track. They could easily be on other tracks. And that's why this type of very ambiguous statement, I think the district court referred to it that way, it's an ambiguous statement. We just don't know what exactly it was supposedly referring to. The appellants want to infer and assume that it relates to this later criminal prosecution in which Mr. Arulian never sees the complaint, never, and that the charges in it aren't found in any of Mr. Arulian's reports. I just believe that as far as evidence, that's a very ambiguous value, Your Honor. You're almost out of time, so why don't you ñ are there any further matters you want to – Just quickly, as to the favorable termination argument, Your Honor, I think the district court hit it on the nail head when they said there's just no hint of evidence that would implicate innocence. We have some discussion between counsel and the court that talking about the thinnest of thin cases, that doesn't implicate – it may implicate the fact that the judge is giving a comment on what they think the evidence is, but it would not really go to innocence. And I think what appellants were talking about could be summed up in there was a final termination as to what was dealt with there, but it wasn't a favorable termination. Well, you can't prosecute them again, right? Right. They won. They won that case, Your Honor. And there's no doubt about that. But that still doesn't – even if they had gone through and been acquitted, that would not indicate there was not probable cause earlier. It would just implicate that one element of the malicious prosecution elements. And since every one of the elements, Your Honor, we'd submit that there's no evidence to support any of those elements, even if they were correct on that one, it wouldn't change the analysis of this case. Thank you for your time, Your Honor. Your Honor. Thank you. Michael Lehman on behalf of the City of Bakersfield and Terry Buss, the Code Enforcement Officer for the City of Bakersfield. May it please the Court. As the Court knows, this is a twofold analysis as it relates to the City of Bakersfield, in that we have first the abuse of discretion issue and whether the district court abused its discretion in not allowing the appellants the additional time that they requested in order to file an opposition, and then the secondary analysis is that of the de novo review as it relates to the underlying summary judgment grant. Addressing the issue of whether or not the court abused its discretion in not allowing Mr. Dowd the time to file the opposition that he requested, clearly the court did not abuse its discretion in this case. According to Federal Rule of Civil Procedure 6B1, clearly he had to file whatever opposition he was going to file or the request to file the opposition by December 30th. He did not do that. In this particular case, what we have is a record indicating that he had a huge motion for summary judgment that he was opposing. He was visiting his mother. He was somewhat unfamiliar with the Federal Rules of Civil Procedure. And clearly in the Kyle v. Campbell suit case, which is although not identical to the facts in this case, it's clear that those are the types of things that are not excusable neglect. And in this case, the court was clearly within its discretion not to allow the opposition to be filed. When was the trial date set? The trial date was set some months later. So how are we leaving aside the question of whether or not the actions constitute excusable neglect or not? How are you prejudiced? How would you have been prejudiced by the granting of the motion? Well, clearly the terms, in terms of being prepared for trial, we would not have been prejudiced. However, in this case, these deadlines are set as firm deadlines so that the party filing the summary judgment in this case has the opportunity to know when the opposition is going to be filed and prepared for the opposition. In this particular case, the summary judgment was granted a couple of days after the late opposition was filed. So clearly in that case, the defendants, City of Bakersfield and Terry Buss, would have been prejudiced. Because you might have lost the motion, you mean? I'm sorry? Because you might have lost the motion. Clearly. I don't think we've ever held that that constitutes prejudice, if we get to the prejudice analysis. I mean, clearly you weren't going to – you had your witnesses, and I gather the discovery had closed, correct? I'm sorry? Discovery had closed? I don't believe discovery had closed in this case. Didn't change your analysis for trial, did it? No, but clearly the analysis here should be whether or not this was excusable neglect. And clearly it was not based on the facts presented. If we're looking at excusable neglect, what should have been done here, knowing all the things that appellant's counsel knew, at the very minimum an extension should have been requested, as was allowed under 6B1 of the Federal Rules of Civil Procedure, knowing all the things that were known. Why don't you turn to the merits? Yes, thank you, Your Honor. The bottom line in this case, as it relates to the merits, is whether or not ultimately there was a good reason to grant the summary judgment based on the merits. And clearly the answer to that question is yes. Was Terry Buss entitled to qualified immunity? The Court found that Mr. Buss wasn't entitled to qualified immunity. And if you look at the record in this case, the record is clear that all Mr. Buss did for the city of Bakersfield was act as a code enforcement officer, not as a prosecutor. As such, he's entitled to qualified immunity. If we were talking about prosecutorial immunity, we would be talking about a different analysis. In this case, he simply provided information to Craig Smith, and that's supported in the record, Craig Smith being the deputy district attorney. And as a code enforcement officer, if all he does is provide information and an independent decision is made by the prosecutor, as it was in this case by Mr. Smith, the ultimate decision whether to prosecute or not is not that of Mr. Buss. It's clearly that of the prosecutor. And the record is clear that the information that he provided was the information that he obtained from his June 2000 review of the premises, and it was part of an inspection that was not just involving the city of Bakersfield but the county and other agencies. If we allow the type of malicious prosecution lawsuits that are allowed in this case, it will have a chilling effect on the ability of investigators and enforcement officers such as Mr. Buss to do their jobs effectively. What he is doing is gathering information based on years of experience, and clearly the decision was ultimately that of Mr. Smith in terms of the prosecution. But all he did was literally provide factual information to Mr. Smith for the prosecution, and as such he's entitled to qualified immunity in this case. If you look at the case law, as qualified immunity is more than just an affirmative defense, it's an immunity, these issues are to be looked at early on in the case. At this stage of the case we were at a summary judgment stage, and the court did exactly what it was supposed to do at the summary judgment stage, decided that this case should not go forward based on the fact that it found that there was clearly absent. How far does that immunity extend, assuming all the facts are not true, and the conclusions are technically wrong? You mean that the factual basis that the court made its decision upon? What the inspector reports to the prosecutor is defective. Well, clearly if the prosecutor presented information that he believed was false, then I think we would be talking about a different situation. But what we're talking about ---- I'm not assessing intentional. I'm assessing both intentional and unintentional. In other words, if the assumed facts or the facts reported are assumed and are not correct, that doesn't ---- I think the ---- indicate any mental state of lying about it. It's just that he didn't do the job very good. I think that if it appears clear to a reasonable person in the position of a code enforcement officer that the information provided is reasonable, I think that's the state of the law. You tested at the officer level, not at the prosecutor's level. That's correct, because in this situation the prosecutor is not involved. Were the prosecutor a party to this case, we'd be talking about a different analysis. But I think in this case the court made an inherent finding that the information provided by code enforcement officer Buss was reasonable to a reasonable person in a similarly situated position. Based on that, I believe that the court properly found that Officer Buss was entitled to qualified immunity, and the court did not abuse its discretion, and that all of the elements that were required in order to find a malicious prosecution case could not be proved. Even if one of those elements could not be proved, then the appellees would be entitled to summary judgment. There was clearly a finding of absence of no probable cause, a finding of presumption of probable cause in this case. There was clearly a finding that there was a lack of favorable determination in that the dismissal by the prosecutor was not after trial. It was, if you look at the Manajian v. Saps case that was cited in our opposition, when a dismissal results from negotiation, settlement, or consent, a favorable termination is usually not recognized, and clearly that's the case here. If you look at the record, the prosecutor dismissed the charges that he dismissed without any discussion of particularly why. And for those reasons, I would ask that the court find in favor of the appellees and affirm the underlying ruling. Thank you, counsel. Rebuttal. Mr. Dowd, at some point, will you tell us whether you have seen any case terminated as yours was terminated, and the finding or conclusion is that amounts to a favorable termination. I think I understand why you are arguing that it's favorable. The case can't be brought again, it's over, and you haven't had to pay any consequences. So in that sense, it's favorable. But normally the word is used to indicate something, and is this, in your view, what it is normally used to indicate? Your Honor, that's a good question. I can't find another case where the prosecutor was chastised by the judge, told that his case was going nowhere, that there was a break, and immediately after the break... You may be testifying when you say chastised by the judge. The record shows what the judge said, and you put a spin on it and called it chastised. Go ahead. No, I mean, what he said was we live in a civilized society, he told him that, he said your case is the thinnest of the thin and getting thinner every moment, Mr. Smith. Yes, I understand. And after that, we took a break, we came back, and the prosecutor dismissed it all, because he could see what was happening to his case. The judge told him what was happening to his case, and therefore, and then he said in relation to count two, that wasn't the thrust of my case. Count two was the count where they were attempting to find a conviction for contaminated waste. That's not the thrust of my case. But he was arguing that, wanted to put these people in prison, they didn't have any contamination. If they had a contaminated waste out there, and they found that in June of 2000, why didn't they do something about it in June of 2000? They prosecuted in April of 2001. You know, I understand why the feelings are strong in the case, and I'm not suggesting there's a reason why there shouldn't be. But we're going to decide this case on the record, this before us, and we've got to, I think that it boils down to, it certainly was concluded, and from your perspective, it was favorable, because you're through. They can't bring the action again, and you're out of there. So we have to look to see, is this favorable, or is it just final? And there's no doubt it's final, but is that normally what we mean when we say favorable? In other words, when I have to go to a jury, I can tell you my answer is no at the moment, so you've got a minute to rebut. Tell me why I'm wrong. Okay. A favorable termination would be if the jury said not guilty. They could never prosecute again. That case is over. When he dismissed, it was exactly the same as if the jury had found him not guilty, exactly the same. They can never re-prosecute, and we walked out of there innocent. Well, you know, it seems to me on one side of the scale you have a jury verdict or a judge verdict after trial. On the other side, the general rule is if it's a negotiated settlement, that may or may not be a favorable determination. And California, under these circumstances, it seems to be that if you have a dismissal coupled with some extrinsic evidence by the time that indicates that may form a favorable termination. So I guess the best you have is to say, one, jeopardy attached, two, the judge made some comments. Is that what you have? And number three, I didn't negotiate. The evidence is void of any negotiations between he and I. Everything occurred on the record. And we just got to decide whether that's enough. And let me say this. I mean, that's what you have on this, right? I mean, that's basically your argument. Yeah, we walked out free, exonerated our bail, and everything was taken care of. But there's one other point I want to make. Mr. Buston, I put this in my brief. He said, you know, we shared reports. We had roundtable discussions about what was going on. When the Honeycutt and Kinney called Mr. Arulian, Mr. Arulian called the prosecutor, Mrs. Kinney said that when she called, the prosecutor and Mr. Arulian were sitting in the same room. They were on a conference call, and she was telling him what was going on. All she said was, I wanted my money back. And then she said ultimately that she was promised payment if she would testify at the trial from somebody's own pocket. And I forgot if that was Mr. Arulian or Mr. Smith. But that was clearly unethical. So they were having roundtable discussions. Mr. Bust had been law enforcement for 25 years. Anyway, I said everything I want to say, and I appreciate your time. Thank you so much.
judges: Farris, Beezer, Thomas